FILED
United States Court of Appeals
Tenth Circuit

May 29, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

No. 08-1196

JOHNNY SCOTT WARREN,

Defendant - Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 1:07-CR-00354-EWN-1)**

Jill M. Wichlens, Assistant Federal Public Defender, (Raymond P. Moore, Federal Public Defender, with her on the briefs), Denver, Colorado, for Defendant - Appellant.

John M. Hutchins, Assistant United States Attorney, (Troy Eid, United States Attorney, with him on the brief), Denver, Colorado, for Plaintiff - Appellee.

Before **KELLY**, **McKAY**, and **HARTZ**, Circuit Judges.

**HARTZ**, Circuit Judge.

On July 21, 2007, four police officers from the Denver Police Department joined three Colorado parole officers on a home visit of state parolee Johnny Scott Warren. At the request of the lead parole officer, a police officer searched

portions of Mr. Warren's residence and discovered crack cocaine in a bathroom and the kitchen. Another parole officer discovered a handgun hidden in a closet. Mr. Warren was convicted of being a felon in possession of a firearm and possessing with intent to distribute a substance containing cocaine base. He appeals, contending that the police officer's warrantless search of his residence violated the Fourth Amendment to the United States Constitution (as applied to the States under the Fourteenth Amendment). We have jurisdiction under 28 U.S.C. § 1291 and affirm. We uphold the search as a special-needs parole search because the participating police officer acted under the direction of a parole officer.

## I.    BACKGROUND

Mr. Warren was placed on parole, effective November 1, 2006, following a state-court conviction for conspiracy to commit robbery. As required by Colorado law, *see* Colo. Rev. Stat. § 17-2-201(5)(f)(I), he signed an agreement that set forth the conditions of his parole. He was to participate in Intensive Supervision for 120 days, during which time he was subject to a curfew and required to carry a pager with him at all times. He was prohibited from possessing firearms or other deadly weapons and from possessing or using illegal drugs. And he had to "allow [his] Parole Officer to search his person, or his residence, or any premises under his control, or any vehicle under his control." R. Vol. I Doc. 20; *see* Colo. Rev. Stat. § 17-2-201(5)(f)(I)(D). Mr. Warren also

signed a Parole Directive and a Security Threat Group Advisement. The Directive prohibited associating with known gang members and possessing gang paraphernalia. The Advisement placed additional prohibitions on gang activity, such as flashing gang signs and wearing gang colors.

In the first few months of 2007 Mr. Warren repeatedly violated the conditions of his parole. He failed several drug tests by testing positive for marijuana, missing the test entirely, or diluting his urine sample with water; and he failed to respond timely to pages on more than one occasion. As a result of these violations, his participation in Intensive Supervision was extended by 180 days on June 1, 2007.

Because Mr. Warren "wasn't doing so well on parole," his supervising parole officer, Brooke Redding, decided that a home visit was in order. R. Vol. II at 21. The purpose of a home visit is to ensure that the parolee is complying with the conditions of his parole. Parole Officer Tina Goodwin described a typical home visit:

> On a home visit, we generally go in, we will speak with the parolee or family members, making sure that everything is going the way it needs to be. We will do a cursory search, you know, to visibly looking [sic] for anything out of the ordinary, anything that would be a violation of parole, if they had alcohol in the refrigerator, things along those lines.

*Id.* at 35-36.

In July 2007 Ms. Goodwin was planning to make home visits in the Montbello area of Denver, where Mr. Warren resided. She e-mailed her colleagues, requesting information on any parolees in the Montbello area whom they would like her to visit. Redding responded, requesting a home visit of Mr. Warren. In preparation for the visit, Ms. Goodwin received a packet of information on Mr. Warren, which noted his affiliation with the Bloods gang.

After making a list of seven to ten parolees to visit, including Mr. Warren, Ms. Goodwin requested assistance from the Denver Police Department. She testified that it is routine for parole officers to request assistance from the local police when making a home visit, particularly if the parolee to be visited has a significant criminal history or gang affiliation. The police "usually are just backup" for the parole officers. *Id.* at 36. The police department provided four officers. One was Tina Goodwin's husband, Paul Goodwin. The police officers had no input into which parolees would receive home visits that evening, nor were they informed of the parolees' names ahead of time. Two parole officers, Louis Zorn and Andy Zavaras, joined Ms. Goodwin and the four police officers. Ms. Goodwin was in charge. Mr. Warren's residence was first on the list.

The team arrived at Mr. Warren's residence at 9:30 p.m. Mr. Warren's wife, Jamila Warren, answered the door and informed the officers that he was not at home. Because he had an 8:00 p.m. curfew, his absence was a violation of the conditions of his parole. Ms. Goodwin asked Ms. Warren to call her husband and

inform him that he needed to return home immediately. She then asked Ms. Warren to show her Mr. Warren's room. Ms. Warren led her upstairs to the master bedroom. Paul Goodwin joined the two women upstairs.

In the bedroom Ms. Goodwin noticed Mr. Warren's pager on top of the dresser. Because he was required to keep the pager with him at all times, this was another violation of the conditions of his parole. Ms. Goodwin also noticed a good deal of red clothing hanging in the closet. She asked Ms. Warren if the clothing belonged to her husband. Ms. Warren responded that it did, but that he had not worn it in a long time. Because Ms. Goodwin considered red clothing, worn by members of the Bloods gang, to be gang paraphernalia, she believed his possession of it to be a third violation of the conditions of his parole. Deciding to conduct a search, Ms. Goodwin sent Ms. Warren downstairs to be with Parole Officer Zavaras, who remained there with Ms. Warren and her four-year-old daughter.

As Tina Goodwin began to remove the red clothing from Mr. Warren's closet (some 30 red items), she asked Police Officer Paul Goodwin to search the remainder of the master bedroom and attached bathroom. Although Ms. Goodwin did not tell her husband what to look for, he was aware that the conditions of Mr. Warren's parole prohibited the possession of gang-related items, firearms, and illegal drugs. In the bathroom cabinet under the sink, Mr. Goodwin discovered what he suspected to be crack cocaine inside a bag hidden within a

hair-product box. Parole Officer Zorn discovered a handgun in the bedroom closet, on a shelf, underneath a sweatshirt. When the bedroom search was completed, Ms. Goodwin asked Mr. Goodwin to go downstairs to search the living room and kitchen area. In the kitchen he discovered what he believed to be crack cocaine and electronic scales in a ceramic jar over the sink. After the search Ms. Goodwin turned the scene over to the police because it had become a criminal matter.

Mr. Warren was charged with one count of being a felon in possession of a firearm, *see* 18 U.S.C. § 922(g)(1), and one count of possessing with intent to distribute a substance containing cocaine base, *see* 21 U.S.C. § 841(a)(1), (b)(1)(A)(iii). He moved to suppress the evidence seized during the home visit. The district court denied his motion, concluding that the evidence had been discovered in a valid parole search. Because Parole Officer Tina Goodwin had authorized and directed the search, and because Police Officer Paul Goodwin had participated "in almost a ministerial capacity," the court ruled that there was no Fourth Amendment violation. R. Vol. II at 111–12.

## II. DISCUSSION

"When reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless clearly erroneous, and review *de novo* the ultimate determination of

reasonableness under the Fourth Amendment." *United States v. Katoa*, 379 F.3d 1203, 1205 (10th Cir. 2004).

"A [parolee's] home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable'." *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987). Ordinarily, a search of a home is reasonable only if it is authorized by a judicial warrant, which must be supported by probable cause. *See* U.S. Const. amend. IV; *Payton v. New York*, 445 U.S. 573, 586 (1980). But for searches of probationers and parolees and their homes, the Supreme Court has embraced two exceptions to the warrant and probable-cause requirements: (1) a special-needs exception and (2) a totality-of-the-circumstances exception. The two exceptions overlap in application, and both are addressed by the parties on appeal. Although we hold that the search of Mr. Warren's home was lawful under the first exception, we also discuss the second for clarity, because the two exceptions are often conflated.

The first exception applies when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Griffin*, 483 U.S. at 873 (internal quotation marks omitted). In *Griffin* the Court considered a Wisconsin regulation that authorized any probation officer to search a probationer's home without a warrant "as long as his supervisor approve[d] and as long as there [were] 'reasonable grounds' to believe the presence of contraband." *Id.* at 871. The Court upheld a search of a

probationer's home by probation officers acting under the regulation. It explained that probationers "do not enjoy the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special probation restrictions." *Id.* at 874 (brackets and internal quotation marks omitted). "These restrictions are meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large." *Id.* at 875. These goals "require and justify the exercise of supervision to assure that the restrictions are in fact observed." *Id.* Accordingly, "[s]upervision . . . is a 'special need' of the State permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large." *Id.*

The Court expressed concern that this "special need" for supervision could be undermined if probation searches were subject to the usual requirements of a warrant and probable cause. With respect to the warrant requirement, the Court said that "the delay inherent in obtaining a warrant would make it more difficult for probation officials to respond quickly to evidence of misconduct." *Id.* at 876. And it observed that "the effect of dispensing with [the] warrant [requirement]" would be less offensive than in the typical criminal investigation because probation officers are not police officers and are "supposed to have in mind the welfare" of their clients. *Id.* As for the probable-cause requirement, the Court said that it "would reduce the deterrent effect of the supervisory arrangement"

between probation officer and probationer because "[t]he probationer would be assured that so long as his illegal . . . activities were sufficiently concealed as to give rise to no more than reasonable suspicion, they would go undetected and uncorrected." *Id.* at 878. Also, said the Court, probation officers should be able to rely on information not usually considered by a judge in assessing probable cause. Because of the probation officer's "ongoing supervisory relationship" with the probationer, the officer should be able to "proceed on the basis of [the probation agency's] entire experience with the probationer . . . and . . . assess probabilities in the light of its knowledge of [the probationer's] life, character, and circumstances." *Id.* at 879. Accordingly, the Court believed that the probable-cause requirement would be "unduly disrupt[ive]" of the probation regime. *Id.* at 878. The Court concluded that the state's "special need[]" to supervise probationers made "[a] warrant requirement impracticable and justif[ied] replacement of the standard of probable cause by 'reasonable grounds.'" *Id.* at 876. It upheld the warrantless search "because it was conducted pursuant to a valid regulation governing probationers." *Id.* at 880.

The second exception to the warrant and probable-cause requirements authorizes warrantless searches without probable cause (or even reasonable suspicion) by police officers with no responsibility for parolees or probationers when the totality of the circumstances renders the search reasonable. *See Samson v. California*, 547 U.S. 843 (2006); *United States v. Knights*, 534 U.S. 112 (2001).

This exception is predicated on (1) the reduced (or absent) expectation of privacy that the Court would recognize for probationers and parolees and (2) the needs of law enforcement. *Knights* considered a police detective's warrantless search of a probationer's apartment that was supported only by reasonable suspicion. Analyzing the search's legality "under [the Court's] general Fourth Amendment approach of examining the totality of the circumstances," *id.* at 118 (internal quotation marks omitted), the Court weighed the probationer's interests against society's. As for the probationer's interests, the Court said that he had a "significantly diminished . . . reasonable expectation of privacy," *id.* at 120, because of his acceptance of a condition of probation authorizing searches by both probation and police officers, *see id.* at 114. And weighed against any interest of the probationer was the state's significant interest "in apprehending violators of the criminal law." *Id.* at 121. The state's interest was particularly great with respect to probationers because a "probationer is more likely than the ordinary citizen to violate the law," *id.* at 120 (internal quotation marks omitted), and a probationer's fragile right to liberty (which may be revoked in proceedings where ordinary trial rights, such as the rights to a jury and proof beyond a reasonable doubt, do not apply) creates special incentives for him "to conceal [his] criminal activities and quickly dispose of incriminating evidence," *id.* The Court concluded that the search was proper despite the absence of a warrant and probable cause. *See id.* at 121–23.

In *Samson* the Court upheld a warrantless search of a California parolee by a police officer who lacked even reasonable suspicion. 547 U.S. at 846. Because of Samson's status as a parolee and the clear terms of a condition of his parole that required him "to submit to suspicionless searches by a parole officer or other peace officer at any time," *id.* at 852 (internal quotation marks omitted), the Court held that he "did not have an expectation of privacy that society would recognize as legitimate." *Id.*[1] The state, in contrast, had compelling reasons to supervise parolees intensively. *See id.* at 853–55.

This appeal can readily be resolved under the special-needs exception recognized in *Griffin*, so we need not decide whether the search could also be affirmed under the totality-of-the-circumstances approach of *Knights* and *Samson*. Indeed, Mr. Warren concedes that the search of his home satisfied virtually every requirement for a special-needs search. He does not challenge the existence of reasonable suspicion, a proper purpose, or the existence of a proper state regulation governing parolee searches. His reply brief explicitly states that he does not challenge any conduct by the parole officers (including their search of his home) or the presence of police officers in his home during the parole search.

---

[1]*Knights and Samson* were unclear regarding the extent to which state law affected the Court's analysis. Perhaps the baseline is that parolees and probationers have a legitimate expectation of privacy but state legislation can remove that legitimate expectation. Or perhaps parolees and probationers have no legitimate expectation unless the state creates one. Deciding the issue, however, is not necessary on this appeal.

His sole argument is that a police officer, Paul Goodwin, violated his Fourth Amendment rights by personally searching his home. We are not persuaded.

This court has already recognized that a police officer may participate in a search of a parolee's home by parole officers so long as the police officer is acting under the direction of a parole officer. In *United States v. McCarty* we said, "In many cases, the police may . . . search a probationer's premises without a warrant at the behest of the parole officer." 82 F.3d 943, 947 (10th Cir. 1996). More recently, we interpreted the *Griffin* special-needs exception "as resting on the rehabilitative relationship between the parolee and the parole officer, and thus not extending to other law enforcement officers *unless they are acting under the direction of the parole officer*." *United States v. Freeman*, 479 F.3d 743, 748 (10th Cir. 2007) (emphasis added). As stated by the First Circuit, "[P]olice officers and parole officers are fungible when the former serve as mere implementers of decisions already made by the latter." *United States v. Cardona*, 903 F.2d 60, 66 (1st Cir. 1990).

In the case before us, we may not agree with the district court that Police Officer Paul Goodwin's participation in the search was almost "ministerial." R. Vol. II at 112. But the test is not whether the police officer acted ministerially. It is whether the police officer acted under the direction of a parole officer. And here that was certainly the case. Parole Officer Tina Goodwin instructed Police Officer Paul Goodwin when to begin searching and what areas

-12-

to search. Because Mr. Goodwin knew that Mr. Warren was prohibited from possessing gang-related items, firearms, and illegal drugs, the scope of the search was not an issue.

Mr. Warren attempts to counter this precedent by relying on Colorado law, asserting that in Colorado only a parole officer may conduct a parole search. He contends that Colorado parolees (unlike those searched in *Knights* and *Samson*) therefore have a legitimate expectation of privacy with respect to searches by police officers, and that violation of this expectation renders a search unconstitutional. We disagree. We can assume, without deciding, that police participation in a special-needs parole search would violate the Fourth Amendment if it violated state law. The problem for Mr. Warren is that he misconstrues Colorado law regarding parole searches.

Colorado Revised Statute § 17-2-201(5) governs the conditions of parole in Colorado. It mandates that each parolee "sign a written agreement that contains such parole conditions as deemed appropriate by the [parole] board, which conditions shall include . . . . [t]hat the parolee . . . allow the community parole officer to make searches of his or her person, residence, or vehicle." *Id.* § 17-2-201(5)(f)(I)(D). Consistent with this provision, Mr. Warren's parole agreement included a condition requiring him "to allow the Parole Officer to search his person, or his residence, or any premises under his control, or any vehicle under his control." R. Vol. I Doc. 20. Mr. Warren is correct that neither

the Colorado statute, nor his parole agreement, explicitly authorizes police officers to participate in a warrantless parole search. But the Colorado Supreme Court has not interpreted the parole-search condition to preclude participation by police officers.

In *People v. McCullough*, 6 P.3d 774, 776 (Colo. 2000) (en banc), a parolee had signed the same standard parole agreement as did Mr. Warren. Although *McCullough* did not concern circumstances in which police officers participated in a warrantless parole search, the court's guidance extended to that situation. It wrote:

> [T]he search must be carried out under the authority of a parole officer. This is not to say that a parole officer may not request that police officers accompany her during the search. To the contrary, we recognize that for the parole officer's safety it may sometimes be necessary to enlist the assistance of police officers. The presence of police officers during a parole search does not, in and of itself, indicate that the search was not conducted in furtherance of the purposes of parole. However, these searches may not be conducted simply as a subterfuge for criminal investigations. They may not be done for the prime purpose of circumventing the ordinary constitutional processes for the convenience of law enforcement officers in the course of their investigation. A parole officer must authorize the search and will normally be present during the search, and the search itself must be related to the rehabilitation and supervision of the parolee.

*Id.* at 781–82 (brackets, citation, footnote, and internal quotation marks omitted).

A footnote to this passage explained further:

> We emphasize that *the purpose of the search, not the presence or absence of a parole officer during the search, is the dispositive factor* in determining whether a search was conducted in furtherance

-14-

> of the purposes of parole.  The presence or absence of a parole
> officer during a parole search is one factor a court may consider in
> determining whether the search was, in fact, conducted in furtherance
> of the purposes of parole.

*Id.* at 782 n.13 (emphasis added, citations omitted).  We infer from this language

that if the search itself is for a proper purpose (as was concededly the case here),

then participation of a police officer is permissible.  Indeed, the Colorado court

contemplated searches in which no parole officer was present—presumably

because police officers conducted all the searching.  The absence of a parole

officer is to be a *factor* in assessing the purpose of a search, but the court clearly

did not believe that it is a dispositive factor.  In our view, the search of

Mr. Warren's home complied with Colorado law.  Mr. Warren's Fourth

Amendment argument therefore fails.

## III.   CONCLUSION

We AFFIRM the judgment below.