**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

VINCENT SCOTT MATHEWS,

     Defendant - Appellant.

No. 18-1215

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:16-CR-00129-WJM-1)**
_____

Kari S. Schmidt (Tyler J. Emerson, with her on the briefs), Conlee Schmidt & Emerson, LLP, Wichita, Kansas, appearing for Appellant.

Karl L. Schock, Assistant United States Attorney (Jason R. Dunn, United States Attorney, with him on the brief), Office of the United States Attorney for the District of Colorado, Denver, Colorado, appearing for Appellee.
_____

Before **BRISCOE**, **HOLMES**, and **McHUGH**, Circuit Judges.
_____

**BRISCOE**, Circuit Judge.
_____

Defendant Vincent Scott Mathews appeals three convictions: two for interfering with commerce by robbery in violation of 18 U.S.C. § 1951 and one for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  He

argues that the district court (1) improperly denied his motion to suppress evidence related to an unconstitutional search of his historical GPS data that was collected when he was serving a state sentence, (2) abused its discretion when it ruled on the admissibility of this evidence without first holding a suppression hearing, and (3) abused its discretion when it allowed the government's expert to testify without first holding a *Daubert* hearing. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

**I**

Mathews was convicted of state crimes in Colorado in 2009 and 2011 and was sentenced to a term of imprisonment. We begin by describing certain relevant operations of the Colorado Department of Corrections ("CDOC") which are applicable to individuals serving state sentences. We will then recount the facts leading to Mathews's arrest on federal charges and subsequent federal convictions.

### A.    The Community Intensive Supervision Program

The CDOC has multiple statuses for individuals who are serving criminal sentences. There is the traditional incarcerated status where an inmate is housed in a prison. There is also a residential corrections facility (i.e. half-way house) status for inmates transitioning from incarceration. Separate, and different, from the residential corrections facility status is Colorado's Community Intensive Supervision program. *See* Colo. Rev. Stat. § 17-27-102(3) (defining a community corrections program); *id.* § 17-27.5-101 (providing the authority for the CDOC to establish intensive supervision programs). Each inmate who enters the Community Intensive

Supervision program is presented with a Community Supervision Lawful Order

("CSL Order") and meets with a Community Parole Officer ("CPO") employed by

the CDOC to discuss the CSL Order and its terms. The Community Intensive

Supervision program is separate from parole but may be required as a condition of

parole. Mathews did not enter the Community Intensive Supervision program as a

condition of parole. Instead, he was still considered an inmate while he participated

in the Community Intensive Supervision program. In other words, he was still

incarcerated, just not physically confined within a prison cell.

On September 10, 2015, Mathews met with his CPO, Wendy Beach, to review

the CSL Order. He placed his initials next to all thirty directives/lawful orders

detailed in the CSL Order and signed it; CPO Beach signed the CSL Order as well.

The following were among the directives/lawful orders:

> 4. You are to be monitored by electronic surveillance equipment and you are responsible for the care, safekeeping, and return of the equipment. You may be required to install your electronic monitoring equipment as instructed by your CPO or a representative of a contracting agency. Installation shall be made immediately upon your return to your residence of record.

*　　*　　*

> 14. You shall allow your CPO to search your person, vehicle, residence or any property under your control.

App. Vol. I at 172, 173.

## B.  Mathews's State Imprisonment, Release, and Subsequent Actions

In 2015, Mathews was serving a period of incarceration with the CDOC for his

prior state convictions. By early 2015, he was serving his sentence at a residential

corrections facility and was assigned to an unidentified CPO.  Greater restrictions were placed on Mathews on September 10, 2015, when he was moved from a residential corrections facility to the Community Intensive Supervision program. CPO Beach was assigned to be his CPO, and the two signed the above-mentioned CSL Order.

According to CPO Beach, there are two types of electronic surveillance used in the Community Intensive Supervision program.  First, there is electronic home monitoring, known as a "cell unit."  A cell unit only determines whether an individual is in his or her home at required times.  Second, there is GPS location monitoring.  Unlike a cell unit, GPS location monitoring "provides an offender's actual location on a continuous basis." *Id.* at 235.  Mathews was originally placed on a cell unit, but on October 1, 2015, Mathews was implicated in certain specific criminal activity.[1]  Based on this information, as well as follow-up conversations with the detective who implicated Mathews in the criminal activity, CPO Beach and her supervisor decided to change Mathews from a cell unit to GPS location monitoring.  CPO Beach informed Mathews that he needed to report to a BI, Inc. facility[2] to have his ankle monitor replaced, and Mathews did so on October 7, 2015.

---

[1] Mathews was suspected of being a passenger in a car driven by his wife that was involved in a drive-by shooting on May 24, 2015.  The same firearm used in this drive-by shooting was later used in a homicide in August 2015.

[2] BI, Inc., provides the GPS monitoring services for the CDOC.

The historical GPS data produced by the ankle monitor is stored in a database and is accessible through a software program called Total Access. BI provides Total Access to the CDOC. The software is web-based and requires a log-in password for access. Historical GPS data is not deleted from Total Access, and each piece of data includes a longitude-latitude coordinate, direction of travel, speed, date, and time.

The record reflects that each CPO with the CDOC has log-in credentials for Total Access which permit the CPO to review all of the GPS data recorded in the Total Access database. One of the CPOs who has log-in credentials for Total Access is Aaron Anderson. In addition to his CPO duties for the CDOC, Anderson has been a task force officer with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") since June 2014. His "dual role" is understood and approved by both the ATF and CDOC.

In 2015, Anderson "was involved" in investigating a string of pawnshop robberies. App. Vol. I at 253. In late October 2015, the ATF investigation team identified Mathews as a possible suspect. Around this time, Anderson contacted CPO Beach to discuss Mathews's potential involvement in the pawnshop robberies and learned that Mathews was on constant GPS location monitoring. As the investigation continued, Mathews remained a peripheral suspect.[3]

---

[3] There were two instances in this investigation that are worth noting but are not relevant to the issues on appeal. First, on January 14, 2016, the primary ATF investigator on the case contacted Anderson and asked him to check Mathews's GPS historical data between 11:00a.m. and 12:00p.m. on that same day because a pawnshop had been robbed. Anderson complied and the historical GPS data showed that Mathews was not in the vicinity of the robbery. Later, in early February,

Two more pawnshop robberies came to the attention of the investigators, one on December 21, 2015, and another on March 23, 2016. After the pawnshop robbery on March 23, 2016, the investigators asked Anderson to check Mathews's historical GPS data for December 21, 2015, and March 23, 2016. Anderson accessed Mathews's historical GPS data for those dates, and the data placed Mathews in the vicinity of the robberies. Anderson subsequently used this information to obtain a search warrant for "an address frequented by Mathews." App. Vol. I at 253. The search that followed yielded inculpatory evidence.

## C. The Federal Indictment, Motion to Suppress, and Conviction

Based on the evidence seized from the address frequented by Mathews, as well as the historical GPS data itself, Mathews was indicted on two counts of interference with interstate commerce by robbery in violation of 18 U.S.C. § 1951. A superseding indictment was later filed that included a third count for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

Before trial, Mathews filed a motion to suppress the historical GPS data from his ankle monitor and any evidence developed from the use of the historical GPS data. He argued that both the GPS data and the fruits of the subsequent search should be suppressed because the historical GPS data was accessed without a warrant. As a

Anderson conducted a search of Mathews's home that complied with the CSL Order and found nothing that was incriminating.

discovery sanction for failure to comply with Rule 16,[4] Mathews also filed a motion to exclude expert testimony from the government's expert which would explain the historical GPS data. In the alternative, he also requested a preliminary *Daubert* hearing to address the expert's credentials to testify as an expert on GPS data. In the motion to exclude expert testimony, Mathews requested that the government provide him with the proposed expert's "analysis," although Mathews acknowledged in his motion that the government had already provided Mathews with the GPS coordinates that were collected by his ankle monitor. The district court denied both motions but also ordered the government to verify whether Mathews had properly plotted the provided GPS coordinates on a map, explain any discrepancies between its understanding of the GPS coordinates and Mathews's understanding of the GPS coordinates, and substantially summarize its expert's opinions regarding the accuracy of the GPS data collected by the ankle monitor.

Following a jury trial, Mathews was convicted on all three counts. He was subsequently sentenced to a total term of imprisonment of 210 months.

## II

Matthews contends that the district court improperly denied his motion to suppress evidence that were fruits of an unconstitutional search of his historical GPS

---

[4] Federal Rule of Criminal Procedure 16(c)(1) requires disclosure of "a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial," which summary must "describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."

data, abused its discretion when it ruled on the admissibility of these fruits without first holding a suppression hearing, and further abused its discretion when it allowed the government's expert to testify about the historical GPS data without first holding a *Daubert* hearing. We discuss each argument in turn and find none persuasive.

### A.     Motion to Suppress

On appeal, Mathews does not argue that the CDOC's collection of his GPS data was unlawful. Instead, he argues that Anderson "searched" his historical GPS data within the meaning of the Fourth Amendment when he accessed the data on Total Access and that his search was an illegal search. The government asserts that Mathews has no reasonable expectation of privacy in his historical GPS data held by the CDOC's contractor and, even if Mathews had a reasonable expectation of privacy in this historical GPS data, Anderson conducted a permissible search under the totality of the circumstances.

"When reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless they are clearly erroneous, and review de novo the ultimate question of reasonableness under the Fourth Amendment." *United States v. Latorre*, 893 F.3d 744, 750 (10th Cir. 2018) (internal quotation marks omitted). For the reasons that follow, we conclude that even if Anderson "searched" Mathews's historical GPS data within the meaning of the Fourth Amendment, he conducted a permissible search under the totality of the circumstances. As a result, we affirm the district court's denial of the motion to suppress.

*1.     The Relevant Fourth Amendment Standard*

Mathews argues that Anderson illegally searched the Total Access database within the meaning of the Fourth Amendment and therefore the fruits of the searches must be suppressed.  Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  "The basic purpose of this Amendment, as recognized in countless decisions of th[e Supreme] Court, is to safeguard the privacy and security of individuals against arbitrary invasions by government officials."  *Camara v. Mun. Ct. of City & Cty. of S.F.*, 387 U.S. 523, 528 (1967).  And to effectuate this basic purpose, the Supreme Court "establish[ed] an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial."  *Herring v. United States*, 555 U.S. 135, 139 (2009).

The protections of the Fourth Amendment generally attach in two scenarios. First, when "the Government obtains information by physically intruding on a constitutionally protected area, . . . a search has undoubtedly occurred."  *United States v. Jones*, 565 U.S. 400, 406 n.3 (2012); *see also Grady v. North Carolina*, 135 S. Ct. 1368, 1370 (2015) (per curiam) ("[A] State also conducts a search when it

attaches a device to a person's body, *without consent*, for the purpose of tracking that individual's movements." (emphasis added)).  Second,

> [w]hen an individual seeks to preserve something as private, and his expectation of privacy is one that society is prepared to recognize as reasonable, we have held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause.

*Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)) (internal quotation marks omitted).  In our case, Mathews does not challenge the state's decision to attach a GPS monitor to him under the CSL Order.[5]  Instead, he argues that he has a reasonable expectation of privacy in his historical GPS data.  We accept his argument, *arguendo*, for our Fourth Amendment analysis.

Mathews's status as a Community Intensive Supervision inmate adds an additional wrinkle to the Fourth Amendment analysis.  The Supreme Court has recognized two exceptions to the Fourth Amendment's warrant requirement in the parolee/probationer context, and for our analysis we assume that Mathews's status is akin to that of a probationer or parolee.[6]  The first exception, generally described as a

---

[5] Further, Mathews neither challenges the CDOC's decision to move him from a cell unit to GPS location monitoring, nor argues that his "consent" to wearing a new ankle monitor with GPS location monitoring was somehow tainted because CPO Beach did not inform him about the increased scope of surveillance when she told him "that he needed to report to a BI facility . . . to have his ankle monitor replaced." App. Vol. I at 236.

[6] "Though parolees have fewer expectations of privacy than probationers, the Supreme Court instructs us to apply the same balancing test to each in determining the constitutionality of a search." *United States v. Freeman*, 479 F.3d 743, 746 n.1

"special needs search," holds that "it is constitutionally reasonable for a parole officer to search parolees in compliance with a parole agreement search provision, but without a warrant." *United States v. Freeman*, 479 F.3d 743, 746 (10th Cir. 2007) (citing *Griffin v. Wisconsin*, 483 U.S. 868, 875–76 (1987)). The second exception, known as the totality-of-the-circumstances exception, "authorizes warrantless searches without probable cause (or even reasonable suspicion) by police officers with no responsibility for parolees or probationers when the totality of the circumstances renders the search reasonable." *United States v. Warren*, 566 F.3d 1211, 1216 (10th Cir. 2009) (citing *Samson v. California*, 547 U.S. 843 (2006); *United States v. Knights*, 534 U.S. 112 (2001)).

The totality-of-the-circumstances "exception is predicated on (1) the reduced (or absent) expectation of privacy . . . for probationers and parolees and (2) the needs of law enforcement." *Id.* "[W]hen the terms of a parolee's parole allow officers to search his person or effects with something less than probable cause, the parolee's reasonable expectation of privacy is significantly diminished." *United States v. Pacheco*, 884 F.3d 1031, 1041 (10th Cir. 2018) (internal quotation marks omitted). We balance this significantly diminished expectation of privacy against the government's "interest in apprehending violators of the criminal law." *Id.* (internal

(10th Cir. 2007) (internal quotation marks omitted). While we recognize that inmates in the Community Intensive Supervision program likely have fewer expectations of privacy than either parolees or probationers, we also conclude that defining the precise contours of an inmate's expectation of privacy in that status relative to those of parolees or probationers is immaterial to our analysis in this case. Therefore, we proceed with the parolee/probationer framework.

quotation marks omitted). Given that "the very assumption of the institution of probation is that the probationer is more likely than the ordinary citizen to violate the law," the government "may therefore justifiably focus on probationers in a way that it does not on the ordinary citizen." *Id.* (internal quotation marks and citations omitted).

As a general matter, a search of a parolee or probationer "authorized by state law" satisfies the totality-of-circumstances exception. *United States v. Mabry*, 728 F.3d 1163, 1167 (10th Cir. 2013). A defendant's "own parole [or probation] agreement and the state regulations applicable to his case" determine whether a search of a parolee or probationer is authorized by state law. *Freeman*, 479 F.3d at 748. Accordingly, "[p]arolee [and probationer] searches are . . . example[s] of the rare instance in which the contours of a federal constitutional right are determined, in part, by the content of state law." *Id.* at 747–48.

2.      *Mathews's Argument on Appeal*

The district court concluded that Anderson's search of the historical GPS data in Total Access was permissible under the totality-of-the-circumstance exception. This conclusion was supported by two related determinations relevant to this appeal. First, the district court concluded that Anderson's search was authorized by a search provision in Mathews's CSL Order, and therefore was authorized by state law. Second, the district court rejected Mathews's argument that he had a heightened expectation of privacy against suspicion-less searches conducted for law enforcement purposes under *People v. McCullough*, 6 P.3d 774 (Colo. 2000). In this appeal,

Mathews principally contends that the district court's latter conclusion is erroneous.[7] We therefore focus our analysis on whether Colorado law grants Mathews a heightened expectation of privacy.

According to Mathews, under Supreme Court and Tenth Circuit precedent, the reasonable expectation of privacy of a parolee, probationer, or inmate in the Community Intensive Supervision program is determined, in part, by the state law governing the relevant program. *See, e.g.*, *Samson*, 547 U.S. at 846 (upholding a suspicion-less search of a parolee's person where parolee signed a parole agreement that allowed a parole officer or other peace officer to search the parolee "with or without a search warrant and with or without cause"); *Mabry*, 728 F.3d at 1167 ("[T]he Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee when such a search is authorized by state law." (internal quotation marks omitted)). And, as Mathews explains, under Colorado law, any warrantless and suspicion-less search of a parolee or probationer must be done in

---

[7] The CSL Order contains the following directive/lawful order: "You shall allow your CPO to search your person, vehicle, residence or any property under your control." App. Vol. I at 173. Notably, Anderson is not Mathews's CPO and, under our precedents, this distinction affects our analysis. *See Freeman*, 479 F.3d at 749–50 (suppressing evidence seized from a search of a parolee's home conducted "without consent, without the presence of a parole officer [as required by the parole agreement], and in violation of Kansas Department of Corrections rules governing parolee searches"). *But see Mabry*, 728 F.3d at 1169 ("Under the totality of the circumstances [exception], the failure to comply with state policies governing searches of parolees is [only one] factor to consider."). However, Mathews did not argue that Anderson's search was outside the scope of the directive/lawful order in the district court and did not brief the argument on appeal. Therefore, we decline to address this issue in the first instance now.

furtherance of the purpose of parole or probation. *See McCullough*, 6 P.3d at 781 (holding that the Fourth Amendment to the United States Constitution requires a warrantless parole search to be conducted in furtherance of the purposes of parole rather than for general law enforcement purposes). Mathews argues that since the search in this case did not meet the "in furtherance" requirement, it violated the Fourth Amendment, and all fruits of the search must be suppressed.

Mathews's argument misses the mark, however, because the United States Supreme Court abrogated the "in furtherance" requirement long before he was placed in the Community Intensive Supervision program. *See People v. Samuels*, 228 P.3d 229, 234 n.1 (Colo. App. 2009) ("Although [*McCullough*] held that [warrantless parolee searches] must be conducted in furtherance of the purposes of parole [rather than for general law enforcement purposes], that requirement was subsequently rejected by the United States Supreme Court in *Knights*."). Given that *McCullough* expressly remarked that the Fourth Amendment and the Colorado Constitution's counterpart "share the same analytical framework," 6 P.3d at 779 n.8, the decision cannot be reasonably understood to shape privacy expectations when the "in furtherance" requirement has been directly contradicted by subsequent Supreme Court cases interpreting the Fourth Amendment. *See Samuels*, 228 P.3d at 234 n.1; *see also Samson*, 547 U.S. at 846 (concluding that a suspicion-less and warrantless search of a parolee, conducted pursuant to statute, is consistent with the Fourth Amendment); *Knights*, 534 U.S. at 122 (explaining that there is "no basis for examining official purpose" of a search of a probationer under the Fourth

Amendment).  Accordingly, we reject Mathews's argument that *McCullough* heightened his expectation of privacy in the historical GPS data.  And, since Mathews does not otherwise contest the lawfulness of Anderson's search under the CSL Order, we conclude that the district court properly denied the motion to suppress.

### B.     The Lack of a Suppression Hearing

Mathews argues that the district court abused its discretion when it ruled on his motion to suppress without first holding a hearing.  Mathews claims that a hearing was required to determine if the CSL Order is "(i) a contract between the Defendant and the State of Colorado, (ii) the Defendant's waiver of rights, or (iii) a simple acknowledgement by the Defendant."  Mathews Opening Br. at 21.  "We review the trial court's denial of an evidentiary hearing on a motion to suppress for an abuse of discretion."  *United States v. Chavez-Marquez*, 66 F.3d 259, 261 (10th Cir. 1995).  "To warrant an evidentiary hearing, the motion to suppress must raise factual allegations that are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in issue."  *Id.* (internal quotation marks omitted).

In this case, the district court did not abuse its discretion when it declined to hold a suppression hearing.  First, as the government correctly points out, Mathews only argues about the legal effect of the CSL Order, not the underlying facts surrounding the document's formation.  *See, e.g.*, Gov't Resp. Br. at 30–31 (explaining that "[t]he only purported factual dispute that Mathews identifies on

appeal is 'the character of the [CSL Order],' and specifically, whether that document is a contract, waiver, or an acknowledgement." (quoting Mathews Opening Br. at 21)); Mathews Reply Br. at 12 ("Ultimately, the fact in dispute is whether the relationship that arose between Mathews and the State of Colorado by virtue of the [CSL Order] constituted a waiver, a contract or nothing more than a mere acknowledgment. Character of the document is material and has a direct bearing on the ultimate determination of the inquiry into the reasonableness of Mathews' expectation of privacy as well as the reasonableness of the Government's search.").

While Mathews argues that the character of the document is a factual rather than a legal determination, he also acknowledges that the character of the document is relevant in determining his reasonable expectation of privacy and the reasonableness of the government's search. But these are questions of law, not fact. *See Mabry*, 728 F.3d at 1166. And Mathews has not identified any additional facts that the district court needed to assess the legal effect of the CSL Order. Accordingly, Mathews's "fact" argument falters.

Second, the CSL Order is wholly silent about how Mathews's historical GPS data can be used. The only provision in the CSL Order that could concern the historical GPS data is the search provision found in Paragraph 14, which states: "You shall allow your CPO to search your person, vehicle, residence or any property under your control." App. Vol. I at 173. But the historical GPS data is under the CDOC's control, not Mathews's. As such, the characterization of the CSL Order as a

"contract," "waiver," or an "acknowledgement" is immaterial to the analysis in this case.

As Mathews states, "if [the CSL Order] is factually a contract or waiver, then the Defendant's reliance on its limits would be relevant to determining the extent of his expectation of privacy in his location information." Mathews Opening Br. at 23. It follows that if the CSL Order does not limit the use of historical GPS data, then whether the CSL Order is a "contract," "waiver," or an "acknowledgement" is irrelevant. Accordingly, we conclude that the district court did not abuse its discretion when it declined to hold a suppression hearing.

## C. The Lack of a *Daubert* Hearing

Mathews's final argument is that the district court abused its discretion when it declined to hold a preliminary *Daubert* hearing before the government's GPS technology expert, James Buck, testified. We review a district court's denial of a preliminary *Daubert* hearing for an abuse of discretion. *See United States v. Nichols*, 169 F.3d 1255, 1263 (10th Cir. 1999); *accord. United States v. Isabella*, 918 F.3d 816, 836 (10th Cir. 2019) ("We review evidentiary decisions applying the [Federal] [R]ules [of Evidence] for abuse of discretion."). A district court abuses its discretion when it "exceed[s] the bounds of permissible choice, given the facts and the applicable law in the case at hand." *United States v. Silva*, 889 F.3d 704, 709 (10th Cir. 2018) (quotation marks omitted).

To begin, Mathews contends that the district court's failure to hold a preliminary *Daubert* hearing is per se reversible error. However, we are bound by

circuit precedent holding that "*Daubert* does not mandate an evidentiary hearing." *Nichols*, 169 F.3d at 1262. Next, Mathews asserts that the district court abdicated its gatekeeping function by only considering the credentials of the government's expert rather than the reliability of his opinions, conclusions, and methodologies. However, Mathews never challenged the reliability of Buck's opinions, conclusions, or methodologies in the district court. "When no objection is raised, district courts are not required to make explicit on-the-record rulings and, we assume that the district court consistently and continually performed a trustworthiness analysis sub silentio of all evidence introduced at trial." *Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1088 n.2 (10th Cir. 2000) (internal quotation marks omitted). And to the extent Mathews now challenges for the first time the reliability of the methods used to generate the historical GPS data, we review only for plain error.[8] *Id.* In this case, Mathews has made absolutely no showing that the historical GPS data presented as evidence is the product of an unreliable method. Therefore, he fails on plain error review.

Moreover, the district court provided Mathews with precisely what he asked for in his *Daubert* motion. In the motion, Mathews argued that a *Daubert* hearing was required because he sought to challenge "Buck's credentials to testify as an expert on GPS data," and that the government had not provided Mathews with Buck's

---

[8] To obtain relief on plain error review, Mathews must show that the district court made (1) an error, (2) that was plain or obvious, (3) that affected his substantial rights, and (4) also seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Pablo*, 696 F.3d 1280, 1287 (10th Cir. 2012).

expert "analysis" of the GPS data that would be used at trial.  App. Vol. I at 83, 84.

But in the same motion, Mathews conceded that the government had notified him of

its intent to use a GPS expert in his trial, identified Buck as the expert that it would

use at the trial, and provided Mathews with the precise GPS coordinate data that

Buck would use against him at the trial.  Further, and again in the same motion,

Mathews acknowledged that Buck had already been qualified as an expert in

historical GPS data in other cases in the United States District Court for the District

of Colorado.  Mathews also provided the precise question he hoped to answer in the

*Daubert* hearing:

> The question under *Daubert* is whether Mr. Buck can lay a foundation for
> the veracity of the GPS data when the Defense believes an
> insurmountable conflict may exist between what the GPS data says about
> Mr. Mathews' movements on March 23, 2016 as compared to the
> statements of witnesses and the videotape within the pawnshop that was
> robbed.

*Id.* at 84.  In response to Mathews's motion, the government provided a summary of

Buck's credentials and likely testimony.  Mathews recognized that the summary

"establishe[d] Mr. Buck's credentials," but argued that "it fail[ed] to set out the bases

of the opinions that would allow the Defense to challenge the expert's opinion in the

instant case."  *See id.* at 221.

Faced with all this, the district court seemed (understandably) somewhat

confused about what exactly Mathews sought from a hearing.  *See id.* at 276 ("The

'analysis' Mathews apparently wishes to receive is something like a map showing

where Mr. Buck has plotted the various GPS coordinates."), 278 ("The Court is

unsure what Mathews means by 'the veracity of the GPS data.'")  The district court

ultimately acquiesced by

> order[ing] the Government to provide a substantial summary of: (1) Mr.
> Buck's explanation of any differences between his plot and Mathews's
> counsel's plot for the same time period; and (2) Mr. Buck's opinions
> regarding the accuracy of GPS data from the sort of ankle monitor at issue
> and the reasons why tracking data obtained through that kind of ankle
> monitor might not reflect its precise location.

*Id.* at 278.  The district court also explained that Mathews would have an opportunity

to cross examine Buck regarding any inconsistencies between the historical GPS data

and conflicting evidence.

In this case, the district court did not abuse its discretion in failing to conduct a

*Daubert* hearing.  It ordered the government to provide Mathews with precisely what

he asked for, namely an explanation to counter what Mathews described as an

"insurmountable conflict" between the GPS data placing Mathews in the vicinity of

the pawnshops at relevant times and his alleged evidence to the contrary.  *Id.* at 84.

Accordingly, we conclude the district court did not abuse its discretion in denying a

*Daubert* hearing.

## III

We affirm Mathews's convictions.