23CA0012 Peo v McRae 08-14-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0012
Adams County District Court No. 22CR198
Honorable Robert W. Kiesnowski, Jr., Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Clifton E. McRae,

Defendant-Appellant.

---

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division VII
Opinion by JUDGE LUM
Lipinsky and Pawar, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 14, 2025

---

Philip J. Weiser, Attorney General, Yaried E. Hailu, Assistant Attorney General Fellow, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, John Plimpton, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Clifton E. McRae, appeals his convictions entered on a jury verdict for possession with intent to distribute methamphetamine and fentanyl.  We reverse and remand for a new trial.

## I.     Background

¶ 2     While on patrol one night, police officer Adam Schroeder observed a white sedan in a 7-Eleven parking lot.  A few seconds later, a silver pickup truck, driven by McRae, pulled up beside the sedan.  Schroeder then saw a woman step out of the sedan, enter the pickup truck, and return to her vehicle a few minutes later.  Although the pickup truck's dome light turned on, Schroeder couldn't see what was happening inside the truck.

¶ 3     McRae and the woman left the parking lot in their respective vehicles and began driving in the same direction.  Believing a drug exchange had occurred, Schroeder followed them.  After observing both vehicles changing lanes a few times, Schroeder saw McRae's truck make an illegal right turn and the woman drive in the opposite direction.  Schroeder initiated a traffic stop of McRae's truck and approached the vehicle at 9:15 p.m.

¶ 4    Schroeder advised McRae of the traffic violation, requested identification and car insurance documents, and asked if McRae had any drugs or weapons. McRae presented his documentation and denied having drugs or weapons in the vehicle. When asked what he was doing at the 7-Eleven with the woman, McRae said that he was meeting her to get gas. Schroeder later said he found McRae's story "odd" because there were no gas pumps at the 7-Eleven. Schroeder told McRae to "hang tight" and returned to his patrol vehicle. Schroeder ran McRae's information through a database and learned he was a parolee, although Schroeder didn't have any information about the underlying offense. In light of this information and his observations at the parking lot, Schroeder decided to ask for McRae's consent to search the pickup truck and at 9:18 p.m. called for a "cover" officer to ensure officer safety during the search. Schroeder remained in his patrol vehicle while he waited for the cover officer, Darren Burton, to arrive. It's unclear from the record whether Schroeder was performing any tasks related to the traffic stop while waiting for Burton; the record doesn't show what Schroeder was doing during that time.

¶ 5    Burton arrived at 9:24 p.m. — about six minutes after Schroeder called for a cover officer.  Burton and Schroeder talked for around one minute — Burton was standing on the passenger side of the patrol vehicle and Schroeder was seated inside. Schroeder apprised Burton of his observations before he pulled McRae over, McRae's explanation of what he was doing at the 7-Eleven, and McRae's parolee status.  Schroeder told Burton that he suspected drug dealing and asked whether a dog sniff was appropriate.  Burton advised that they should talk to McRae. Finally, Schroeder said that he had contemplated looking up McRae's criminal history "to see if [McRae's prior convictions involved] dangerous drugs or anything."  Burton replied, "[L]et's go talk to him."

¶ 6    At 9:26 p.m., about eleven minutes after the initial stop, the two officers approached McRae's truck, requested that McRae roll down his window because it was dark, and asked whether they could search his car.  McRae declined to give consent.  Seconds later, Burton saw a plastic bag sticking out of a backpack located on the front seat and asked, "What's in the Ziploc baggie right here? That wouldn't happen to be drug paraphernalia, would it?"  McRae

responded that it was his pills, became irritated, and declined to show the contents of the bag upon the officers' request.

¶ 7 The officers asked McRae to exit the vehicle. After further questioning by the officers, McRae consented to a vehicle search. The officers discovered methamphetamine and fentanyl in multiple plastic bags in McRae's backpack and arrested him.

¶ 8 McRae was charged with possession with intent to distribute methamphetamine and fentanyl. §§ 18-18-405(1), -405(2)(a)(I)(B), -405(2)(b)(I)(A), C.R.S. 2024. The district court denied his pretrial motion to suppress the drug evidence that the officers had obtained. McRae was convicted as charged and sentenced to twenty-five years in the custody of the Department of Corrections. He appeals.

## II. Suppression of Evidence

¶ 9 McRae doesn't contest the validity of the initial traffic stop. Instead, he argues that the district court erred by denying his motion to suppress the drug evidence because the officers unconstitutionally prolonged the stop. We agree.

## A.    Standard of Review and Applicable Law

¶ 10    "A trial court's suppression order presents a mixed question of fact and law." *People v. Gamboa-Jimenez*, 2022 COA 10, ¶ 35.  "We defer to the court's factual findings if they are supported by competent evidence in the record, but we assess the legal significance of those facts de novo." *Id.*  However, we may also rely on undisputed facts in the record, and we may independently review any portion of the challenged incident that was audio- or video-recorded.  *People v. Willoughby*, 2023 CO 10, ¶ 18; *see also People v. Taylor*, 2018 CO 35, ¶ 7.

¶ 11    "The Fourth Amendment to the United States Constitution guards citizens against 'unreasonable searches and seizures' by the police."  *People v. Johnson*, 2024 CO 47, ¶ 23 (quoting U.S. Const. amend. IV); *see also* U.S. Const. amend. XIV.  "Absent an exception, a warrantless search or seizure of a person is presumed unreasonable and in violation of the Fourth Amendment."  *Johnson*, ¶ 23.

¶ 12    "When police obtain evidence in violation of the Fourth Amendment, the exclusionary rule ordinarily bars the prosecution from introducing that evidence against the defendant in a criminal

case." *People v. Vaughn*, 2014 CO 71, ¶ 10. One exception to the warrant requirement is an investigatory stop that is "supported by reasonable suspicion." *People v. Chavez-Barragan*, 2016 CO 66, ¶ 19; *see also People v. Funez-Paiagua*, 2012 CO 37, ¶ 7.

¶ 13 A traffic stop is a "limited, investigatory intrusion[]" regarding a suspected traffic violation. *Chavez-Barragan*, ¶ 19. A traffic stop prompted by reasonable suspicion of a traffic violation "can become unreasonable if it is 'prolonged beyond the time reasonably required to complete' the purpose of the stop." *Johnson*, ¶ 26 (quoting *Chavez-Barragan*, ¶ 20); *see also Rodriguez v. United States*, 575 U.S. 348, 354 (2015); *United States v. Frazier*, 30 F.4th 1165, 1173 (10th Cir. 2022). Law enforcement may not conduct an on-scene investigation of ordinary criminal activity "in a way that prolongs the [traffic] stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 575 U.S. at 355.

¶ 14 We determine whether an officer had reasonable suspicion by looking for specific facts "'known to the officer,' which 'taken together with rational inferences from those facts,' gave rise to 'a reasonable and articulable suspicion of criminal activity' justifying

6

the intrusion into the defendant's personal privacy." *People v. Wheeler*, 2020 CO 65, ¶ 13 (quoting *Funez-Paiagua*, ¶ 9). "This is an objective inquiry that requires us to consider the totality of the circumstances at the time of the intrusion." *Gamboa-Jimenez*, ¶ 40.

## B. Analysis

¶ 15    In its suppression order, the district court concluded that the traffic stop was prolonged but that the prolongation was justified by reasonable suspicion based on "the events in the 7-[Eleven] parking lot and Officer Burton seeing the Ziploc baggies in plain view."

¶ 16    To determine whether the court erred, we must answer two questions. First, did the officers prolong the traffic stop by diverting from their traffic-based mission to investigate other criminal activity in a way that added time to the stop? *Rodriguez*, 575 U.S. at 355. And second, if so, did the officers have reasonable suspicion to justify detaining McRae for the non-traffic investigation at the time the stop was diverted? *Id.*; *see also Frazier*, 30 F.4th at 1174, 1179 (when assessing reasonable suspicion, the court should consider only the facts known to the officer at the moment the officer extended the traffic stop).

¶ 17    Although the district court concluded that the stop was prolonged, it didn't identify precisely when the prolongation occurred. We discern a clear "detour" from the traffic stop's mission at the time Burton arrived on the scene.[1] *Rodriguez,* 575 U.S. at 356. The record shows that Schroeder planned to ask for consent to search the vehicle because he suspected McRae had drugs, and he called for assistance to provide "cover" when he performed the search. *Id.* ("On-scene investigation into other crimes . . . detours from [the traffic stop's] mission. *So too do safety precautions taken in order to facilitate such detours.*") (emphasis added). And when Burton arrived, the officers spent about a minute discussing only their suspicion that McRae had drugs in his truck and how they could obtain more information about the suspected drugs. Therefore, this interaction detoured from the

---

[1] McRae argues that the diversion occurred earlier, when Schoeder called for a cover officer and waited for the officer to arrive. However, the district court didn't make findings about whether Schroeder conducted other traffic-stop-related tasks while waiting, and it's not clear from Schroeder's body camera footage or other parts of the record what he was doing in his patrol vehicle during that time. Because we nevertheless conclude that an unjustified prolongation occurred, we need not resolve this issue.

traffic-based mission to investigate suspected drug possession in a way that added time to the stop. *Id.* at 356-57.

¶ 18     Next, we must determine whether the officers had reasonable suspicion of other criminal activity at the point of the detour — when Burton arrived on the scene, but before the officers spotted the plastic bag in McRae's car. *See Frazier*, 30 F.4th at 1174, 1179. Though it's a close call, we conclude that the answer is "no."

¶ 19     At the time Burton arrived, Schroeder knew (1) McRae and a woman had a brief interaction at the 7-Eleven; (2) McRae said that he and the woman were meeting to get gas; and (3) McRae was a parolee. We conclude that these observations — individually or collectively — don't rise to the level of reasonable suspicion of criminal activity.

¶ 20     From what he observed in the 7-Eleven parking lot, Schroeder knew that (1) a woman entered and exited Schroeder's truck; (2) McRae and the woman seemed to be traveling somewhere together after leaving the parking lot; and (3) the woman drove off in a different direction from McRae right before Schroeder pulled McRae over. Schoeder testified that he couldn't see what was happening inside the truck other than the dome light being switched on, he

9

didn't see McRae and the woman touch each other at any point, and he didn't see any exchange of objects. He also testified that McRae's explanation of the meeting struck him as "odd," given that the 7-Eleven didn't have gas pumps.

¶ 21    Although Schroeder stated that his training informed his suspicion that he had observed a drug deal, we can't say that these facts, without more, give rise to reasonable suspicion. *See People v. Greer*, 860 P.2d 528, 529-32 (Colo. 1993) (concluding that a police officer lacked reasonable suspicion when the officer observed two individuals talking closely in an area known for narcotics sales, but the officer didn't see the suspects' hands or the exchange of objects); *Outlaw v. People*, 17 P.3d 150, 158 (Colo. 2001) (concluding that no reasonable suspicion existed when the officer, on patrol in a neighborhood known for drug transactions, didn't see any drug transaction and couldn't ascertain the conversation taking place between the suspects). The 7-Eleven wasn't in an area known for drug trafficking, Schroeder didn't see an exchange of objects or money, he didn't hear any conversation between McRae and the woman, and neither participant was a known drug dealer. *Cf. People v. Ratcliff*, 778 P.2d 1371, 1378-79 (Colo. 1989) (holding that

reasonable suspicion existed when an officer observed a known drug supplier walk up to another individual in a known drug area and simultaneously exchange objects while trying to conceal their behavior); *People v. Canton*, 951 P.2d 907, 910-11 (Colo. 1998) (determining that an officer had reasonable suspicion when the officer received an anonymous tip of drug dealing, observed a large group of males gathered in a known drug area, and saw the defendant holding a large amount of cash).

¶ 22    We also conclude that McRae's status as a parolee didn't elevate Schoeder's observations to reasonable suspicion because Schoeder didn't know the nature of McRae's underlying offense. *Cf. Ratcliff*, 778 P.2d at 1378-79 (one party's status as a known drug dealer, coupled with other factors, fostered reasonable suspicion of a drug exchange); *United States v. Sandoval*, 29 F.3d 537, 542 (10th Cir. 1994) (past criminal conduct does not, by itself, give rise to reasonable suspicion of present criminal behavior).

¶ 23    For the above reasons, we conclude that the district court erred by denying McRae's motion to suppress.

### C.    Warrantless Search of Parolees

¶ 24    Nevertheless, the People contend that the officers could search McRae's vehicle regardless of reasonable suspicion because of his parolee status. We disagree.

¶ 25    To support their argument, the People rely on a "totality-of-the-circumstances" exception, which "authorizes warrantless searches [of parolees or probationers] without probable cause (or even reasonable suspicion) by police officers with no responsibility for parolees or probationers when the totality of the circumstances renders the search reasonable." *United States v. Mathews*, 928 F.3d 968, 976 (10th Cir. 2019) (quoting *United States v. Warren*, 566 F.3d 1211, 1216 (10th Cir. 2009)).

¶ 26    *Mathews* notes that a search of a parolee or probationer satisfies the totality-of-the-circumstances exception if authorized by state law. *Id.* The search in that case satisfied the exception because it was conducted pursuant to a search provision in the defendant's parole agreement. *Id.* at 975-76; *see also Samson v. California*, 547 U.S. 843, 846, 852-57 (2006) (suspicionless search of parolee by police officer was constitutional when California statute required every prisoner eligible for release on state parole to

12

"agree in writing to be subject to search or seizure by a parole officer or other peace officer . . . , with or without a search warrant and with or without cause").

¶ 27    Here, however, there isn't any evidence that McRae signed a parole agreement consenting to suspicionless searches, and no state law authorized Schroeder and Burton to search McRae's property based on his parolee status. Section 17-2-201(5)(f)(I)(D), C.R.S. 2024, requires parolees to submit to suspicionless vehicle searches by "the community parole officer," but Schroeder and Burton weren't parole officers. We therefore decline to apply the totality-of-the-circumstances exception in this case.

## III.    Disposition

¶ 28    The judgment of conviction is reversed, and the case is remanded for a new trial consistent with this opinion.

JUDGE LIPINSKY and JUDGE PAWAR concur.