**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 21, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

DAVID LEROY EARLS,

    Defendant - Appellant.

No. 22-7051

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:21-CR-00136-RAW-1)**

_____

Stuart W. Southerland, Research and Writing Specialist (Scott A. Graham, Interim Public Defender, and Richard Koller, Assistant Federal Public Defender, with him on the briefs) Office of the Federal Public Defender, Eastern District of Oklahoma, Muskogee, Oklahoma, for Defendant-Appellant David Leroy Earls.

Lauren S. Zurier, Special Assistant United States Attorney (Christopher J. Wilson, United States Attorney, and Linda A. Epperley, Assistant United States Attorney, with her on the brief) Muskogee, Oklahoma, for Plaintiff-Appellee United States of America.

_____

Before **HARTZ**, **EBEL**, and **CARSON**, Circuit Judges.

_____

**EBEL**, Circuit Judge.

_____

A jury convicted Defendant David Leroy Earls on three counts of "engag[ing] in a sex act with [a] person . . . incapable of appraising the nature of the conduct," 18 U.S.C. § 2242(2)(A)—the eighteen-year-old intellectually disabled daughter of Earls' long-time girlfriend.  In this direct criminal appeal, Earls challenges his convictions and the resulting 140-month prison sentence.  Because Earls admitted to having sex with the victim, C.P., the primary questions for the jury at trial were whether C.P. was "incapable of appraising the nature of the conduct" between her and Earls and, if so, whether Earls knew of C.P.'s incapacity.  The jury resolved both of those fact questions against Earls.  On appeal, he argues that there was insufficient evidence for a reasonable jury to make either of those findings beyond a reasonable doubt.  We disagree.  We also reject several alleged trial errors that Earls asserts and, therefore, uphold his convictions.  The Government, however, correctly concedes that the district court erred in calculating Earls' sentence.  Thus, having jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we AFFIRM Earls' three convictions but REMAND this case to the district court with instructions to vacate Earls' sentence and to resentence him consistent with this opinion.

## I. BACKGROUND

Viewed in the light most favorable to the Government, see United States v. Stepp, 89 F.4th 826, 831–32 (10th Cir. 2023), the evidence presented at trial indicated the following: Thirty-five-year old Earls, an enrolled member of the Cherokee Nation, lived with his girlfriend, Gayla, in a home located within the exterior boundaries of the Cherokee Indian Reservation.  Gayla's daughter, C.P., as well as

2

several other family members, also lived in the home.  C.P. has a mild to moderate intellectual disability and suffers from, among other things, schizophrenia affective disorder and bipolar disorder with psychotic features.  C.P.'s great grandmother, Barbara, who lived in the same house, was C.P.'s guardian until C.P. turned eighteen.

Earls had lived with Gayla since C.P. was approximately seven years old.  At about the time that C.P. turned eighteen, Earls began inviting her to play "sex games" with him.  (I R. 334.)  These "sex games" would occur in Earls' attic bedroom after C.P.'s mother went to sleep.  Earls admitted having sex with C.P. several times.

On that basis, a federal grand jury indicted Earls on three counts of violating 18 U.S.C. § 2242(2)(A), which prohibits "knowingly . . . engag[ing] in a sexual act with another person if that other person is . . . incapable of appraising the nature of the conduct."[1]  Each of the three counts charged a different sex act: Count 1 charged

---

[1] 18 U.S.C. § 2242, entitled "Sexual abuse," states in relevant part:

> Whoever, in the special maritime and territorial jurisdiction of the United States . . . , knowingly--
>
>     . . . .
>
>     **(2)** engages in a sexual act with another person if that other person is--
>
>         **(A)** incapable of appraising the nature of the conduct;
>
>         . . . .
>
> or attempts to do so, shall be fined under this title and imprisoned for any term of years or for life.

3

"penetration, however slight, between the penis and vulva of C.P."; Count 2 charged

"penetration, however slight, of the genital opening, by finger with the intent to

abuse, humiliate, harass, degrade, arouse, and gratify the sexual desire of any person,

of C.P."; and Count 3 charged "contact between the mouth of the defendant and the

vulva of C.P." (I R. 14–15.) The indictment further alleged that Earls was an

"Indian" and that each of these three offenses occurred "in Indian Country,"

"[b]eginning on or about January 1, 2019[,] and continuing until on or about

February 11, 2020." (Id.)

Because Earls admitted having sex with C.P., the primary fact questions at trial

were whether C.P. was "incapable of appraising the nature of the conduct" between

her and Earls and, if so, whether Earls knew of C.P.'s incapacity. The Government

presented the following evidence: Helen Dudley, C.P.'s great aunt, testified that a

state court had appointed Dudley and her husband to be C.P.'s guardians after the

events at issue in this case occurred. The state court determined that the guardianship

was necessary because C.P.

> is impaired by reason of reduced intellectual abilities, Schizophrenia Affective Disorder, bipolar with psychotic features and Hypothyroidism and that this impairment results in her inability to receive and evaluate information effectively, meet the essential requirements for her physical health and safety and in her inability to manage her financial resources. She has been found disabled by Social Security Administration and she receives SSI benefits. [The Dudleys] are already the payee of her SSI benefits. [C.P.] is currently unable to properly handle her person, her property and her general affairs, without assistance.

(Supp. R. 1–2.)

4

Dudley also testified as follows about C.P.'s functional limitations: As a result of her intellectual disability and mental illnesses, C.P. will never be able to live independently. Regarding her mental illnesses, C.P. cannot be left alone for very long because she hears voices that tell her to kill herself. C.P. twice spent a week in a mental hospital after attacking relatives with weapons. Regarding her intellectual disability, C.P. "cannot absorb information like other people. She has to do [something] repetitively for a really long time for her to learn it." (I R. 238.) She is easily confused. C.P. has received Social Security disability payments since she was quite young. C.P. can use a microwave, but she has difficulty with microwaving instructions; she cannot cook on a stove; is unable to make Kool-Aid; can do simple chores but only when prompted; has no concept of time and lacks the hand-eye coordination to drive or use a riding mower. C.P can do second-grade math and reads at a fifth-grade level. She plays with eight- and ten-year-old children as peers. C.P. is a "follower," and "just wants to make people happy." (I R. 237.) "[I]f she wants someone to be her friend, she will either give them stuff or she will do whatever they ask her to do." (Id.)

The Government also presented testimony from three experts. Dr. Kathleen Ward, Ph.D., a clinical psychologist, testified about assessments she conducted of C.P. in 2015 and again in 2019. In 2015, when she was approximately fourteen, C.P. scored 50 on the Wechsler IQ test; in 2019, she scored 59. "[A] score of 50 or a 55 is extremely low," indicative of moderate intellectual disability (I R. 280), while 59 indicates mild intellectual disability. Both scores placed C.P. in the lowest one

5

percentile of the population as a whole. In both 2015 and 2019, C.P.'s "adaptive behavior" test scores—which measure a person's "[d]ay-to-day living skills, judgment, problem solving, communication, coping skills, habilitation skills, bathing, dressing, laundry, cooking" (I R. 287)—were "[v]ery low" (I R. 283), again in the lowest one percentile of the population.

Dr. Ward's 2015 and 2019 written evaluations were admitted into evidence. In addition to corroborating Dr. Ward's testimony about C.P.'s intellectual disability, the written evaluations indicated that C.P. has "difficulties in reality testing" (Supp. R. 9, 18) and,

> [t]hough she appears "present" and connected when in momentary conversation, she appears to "drift" and seems, at times, to be responding to internal stimuli. . . . She makes alarming claims that do not have the ring of authenticity, as the details ebb and flow and grow as she appears to become emotionally invested in them.

(Id. at 13.) In 2019, Dr. Ward opined that C.P. "has a significant developmental delay and her social demeanor has a vacancy, a disconnect that is not fully explained by cognitive impairment. . . . Her spontaneous writing . . . suggests difficulties in reality testing and severe emotional dysregulation." (Id. at 18.)

The second Government expert, Jerry Dawn Dennis, a licensed professional counselor, testified that she counseled C.P. for approximately three years, beginning in 2009, when C.P.'s school referred then nine-year-old C.P for counselling because of problems she was having in the classroom. Dennis counselled C.P. at that time for social skills, confidence, self-esteem, and depression. Dennis began counselling C.P. again, in March 2020, after the charged sexual conduct between C.P. and Earls had

occurred, to "overcome the trauma" "following a rape" involving Earls.  (I R. 304.)

Dennis opined that C.P. would not be able to function without supervision and that

she is easily manipulated.  Dennis further testified that C.P.'s development and

ability to care for herself had not improved during the ten years that Dennis, off and

on, had counselled her.

The third expert to testify was Cynthia Sanford, a nurse practitioner trained to

perform sexual assault nurse examinations ("SANEs").  As discussed below, Earls

challenges her testimony in this appeal.  Nurse Sanford testified about the

February 11, 2020, SANE she conducted on C.P., after her sexual relationship with

Earls came to light.  SANEs generally involve physically examining and interviewing

an alleged sexual abuse victim.  Nurse Sanford testified that, although C.P. was

chronologically eighteen years old, her answers to the nurse's questions and her

demeanor were more like that of a child of ten to twelve years of age.  C.P. told

Nurse Sanford about playing "sex games" with Earls in his attic bedroom.  (I R. 334.)

According to C.P., this happened "a lot."  (I R. 336.)  C.P. further told Nurse Sanford

that C.P. was afraid of Earls because "he had told her he had friends that would kill

her" and that, one time when Earls came into C.P.'s bedroom, she pretended to be

asleep because "she was afraid he would have a weapon"; "she had seen him pull a

knife before."  (I R. 335.)  Nurse Sanford's physical examination corroborated that

C.P. had been penetrated vaginally.

Sheriff's Deputy Lori Chips Bray testified about interviewing Earls concerning

his sexual relationship with C.P.  In addition, a videorecording of that interview was

admitted into evidence. During that interview, Earls admitted having sex with C.P. twice after she turned eighteen. Earls stated that C.P. constantly badgered him to have sex with her. He acknowledged that C.P. had a mental disability but asserted that she is smart, even brilliant at times; yet on other days she withdraws into her own world.

Finally, C.P. testified. She testified as follows: She was able to identify the body parts involved in sex and to use those body parts to describe the "sex games" Earls played with her. According to C.P., Earls told her not to tell her great grandmother Barbara about the sex games so they would not get into trouble, but C.P. could not remember what kind of trouble that might be. C.P. also testified that she did not know what "sex is," she "keep[s] forgetting what that means," and that her Aunt Gina "usually explains to me what sex means." (I R. 407–08.) But C.P. knew that sex could result in pregnancy, which was when a woman has a baby in her uterus, and that she herself could not get pregnant because she had a birth control patch on her arm.

Earls did not testify or present any evidence. A jury convicted him of all three charged offenses. The district court sentenced Earls to 140 months in prison on each count, to run concurrently.

## II. DISCUSSION

## A. There was sufficient evidence to support Earls' convictions

8

The trial court instructed jurors that, to convict Earls of each of the charged sexual abuse offenses, they had to find beyond a reasonable doubt, among other things, the following elements:

> **First:** beginning on or about January 1, 2019, and continuing until on or about February 11, 2020, the defendant knowingly caused C.P. to engage in a sexual act, as defined for each count below;
>
> **Second:** C.P. is a person who is incapable of appraising the nature of sexual conduct;
>
> **Third:** at the time of the sexual act, the defendant knew that C.P. was incapable of appraising the nature of sexual conduct;
>
> **Fourth:** the defendant is a recognized member of an Indian tribe; and
>
> **Fifth:** the sexual act took place within the Eastern District of Oklahoma, in Indian country, which is within the territorial jurisdiction of the United States.

(I R. 198–99.[2])  On appeal, Earls asserts there was insufficient evidence from which the jury could have found the second and third elements beyond a reasonable doubt.

## 1.  Standard of review

We review the sufficiency of the evidence to support a conviction de novo to "determine whether, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt." United States v. Gordon, 710 F.3d 1124, 1141 (10th Cir. 2013). In conducting this review, "we consider all of the evidence, direct and circumstantial, along with reasonable inferences, but we do not weigh the evidence or consider the relative credibility of witnesses." United States v. Griffith, 928 F.3d 855, 868–69 (10th Cir. 2019) (quotation marks omitted). Thus, our review is limited and deferential; "we may reverse only if no rational trier of fact could have found the essential

---

[2] Earls does not challenge this instruction and neither party requested a different one.

9

elements of the crime beyond a reasonable doubt." Id. at 869 (quotation marks omitted).

Stepp, 89 F.4th at 831–32.

**2. There was sufficient evidence for a rational jury to find beyond a reasonable doubt that C.P. was incapable of appraising the nature of the sexual conduct between her and Earls**

Whether C.P. was incapable of appraising the nature of the charged sexual conduct between her and Earls is a fact question. See United States v. Freeman, 70 F.4th 1265, 1279 (10th Cir. 2023). "Appraising" means "to judge and analyze the . . . significance" of something. Webster's Third New Int'l Dictionary (1986); see also https://www.merriamwebster.com/dictionary/appraise (last visited Feb. 5, 2025). To appraise—that is, to judge and analyze the significance of—the nature of the charged sexual conduct requires more than simply being able to describe the physical act of sex. It also requires, for example, the ability to judge and analyze the consequences of the sexual conduct on the victim, to be sure, but also upon the human environment surrounding the victim which will have an impact upon the victim.

There was evidence that C.P. could recite some of the possible consequences of the sexual conduct: that it could result in pregnancy, pregnancy was when a woman had a baby in her uterus, and that she herself could not get pregnant because she had a birth control patch. But there was also evidence that C.P. was unable to judge and analyze other consequences, including the likely objectionable, or disruptive, nature of the charged sexual conduct to C.P.'s personal life and her

10

surrounding family and community.[3]  This does <u>not</u> suggest, however, that jurors make religious or moral judgments about the charged conduct, deciding when it is religiously or morally right or wrong for a person to have sex and with whom.  In that regard, we agree with Earls that § 2242(2)(A) does not commission juries to make a moral judgment about whether he should have had sex with C.P.[4]

Deciding whether a person is unable to judge and analyze the "nature" of the charged sexual conduct, however, must include consideration of the context in which that conduct occurred.  Here, that context required the jury to determine whether C.P. was incapable of appraising the consequences and disruptive impact to her family and community of having sex with her mother's long-term live-in boyfriend Earls.  There was evidence from which a rational jury could find beyond a reasonable doubt that C.P. lacked this capacity.  C.P. testified, in particular, that Earls told her not to tell her guardian at about that time—her great grandmother Barbara—because, if Barbara found out, Earls and C.P. would be in trouble.  But C.P. did not know what trouble they would be in.  The evidence of C.P.'s limited intellectual functioning and

---

[3] We agree with the district court that what the jury had to determine in this case was not whether C.P. can ever consent to sex, but instead whether she was "incapable of appraising the nature of the conduct" that occurred between her and Earls specifically.

[4] <u>Cf.</u> Model Penal Code § 213.1 commentary pp. 321–23 (1980) (rejecting requiring proof that victim lacked "the ability to comprehend the moral nature of the act" in favor of standard requiring proof that the person was "incapable of appraising the nature of her conduct"; "[b]y specifying that the woman must lack ability to assess the 'nature' of her conduct, the statute is intended to avoid questions of value judgment and of remote consequences of immediate acts").

adaptive behavior, as well as her trouble testing reality, bolstered C.P.'s testimony that she did not understand why she and Earls would be in trouble for playing sex games.  Lastly, but importantly, the evidence before the jurors included their direct observation of C.P. during her testimony.

This evidence was sufficient for a rational jury to find beyond a reasonable doubt that C.P. was incapable of appraising the nature of the sexual conduct between her and Earls.  See United States v. R.D.A., No. 97-5145, 1998 WL 480158, *1 (10th Cir. Aug. 7, 1998) (unpublished[5]) (upholding juvenile delinquent adjudication based on commission of § 2242(2)(A) offense committed against juvenile victim who "function[ed] mentally at a younger age than his physical age" and who "did not understand that there might be anything objectionable about defendant's contact"—anally sodomizing the victim).

As a general principle, we agree with Earls that § 2242(2)(A) "does not prohibit all intellectually disabled persons from having sex" (Aplt. Reply Br. 1). But, contrary to Earls' assertion, here there was much more evidence to support a finding that C.P. was incapable of appraising the nature of the conduct between her and Earls, including its impact on her community and its disruptive consequences, than simply C.P.'s low IQ.  There was also evidence of C.P.'s low adaptive behavior scores and her mental illnesses which distort her perception of reality, as well as her testimony that she did not know why she and Earls could get in trouble if her family

---

[5] R.D.A. is unpublished and therefore nonbinding, but we find its reasoning persuasive.

12

members found out about their sex games.  We conclude, therefore, that there was sufficient evidence presented at trial from which a rational jury could find beyond a reasonable doubt that C.P. was incapable of appraising the nature of the charged conduct between her and Earls.

### 3.  There was also sufficient evidence for a rational jury to find beyond a reasonable doubt that Earls knew that C.P. was incapable of appraising the nature of the sexual conduct between them

18 U.S.C. § 2242(2)(A) makes it a federal crime "knowingly" to "engage[] in a sexual act with a person if that person is . . . incapable of appraising the nature of the conduct."  Earls next asserts that there was insufficient evidence for a rational jury to find, beyond a reasonable doubt, that he knew that C.P. was "incapable of appraising the nature of the [sexual] conduct" between them.  As an initial matter, this circuit has not previously "addressed whether the 'knowingly' mens rea" in § 2242(2)(A) "extends to knowledge of the victim's incapacity or only to knowledge that the defendant was engaging in a sexual act."  United States v. A.S., 939 F.3d 1063, 1079 n.6 (10th Cir. 2019).  We conclude that the "knowingly" mens rea requires proof that the defendant had knowledge of the victim's incapacity.  See United States v. Fast Horse, 747 F.3d 1040, 1041 (8th Cir. 2014) (citing United States v. Bruguier, 735 F.3d 754, 757–63 (8th Cir. 2013) (en banc)).

Here, we have no trouble concluding that there was sufficient evidence from which a rational jury could find beyond a reasonable doubt that Earls knew that C.P. was "incapable of appraising the nature of the [sexual] conduct" between them.  That evidence included testimony from C.P.'s current guardian, Helen Dudley, that C.P.'s

13

functional limitations are "obvious"; "[m]ost people can see it within about five minutes." (I R. 243.) The jury also observed C.P. testify. Earls had been around C.P. for more than ten years, since she was approximately seven years old, and Earls indicated that he interacted with C.P. when he was around her. He described, for example, C.P. following him around like a little puppy and he stated that, when he tried to teach her things, C.P. would take the attention he gave her the wrong way. Earls acknowledged in his recorded interview that C.P. had been diagnosed with mental disabilities, for which she received Social Security disability payments, and that sometimes C.P. withdraws into her own world. This evidence was sufficient to support a rational jury finding beyond a reasonable doubt that Earls knew that C.P. was "incapable of appraising the nature of the conduct" between them.

## B. Earls' challenges to Nurse Practitioner Cynthia Sanford's expert testimony do not warrant relief

Earl challenges Nurse Practitioner Sanford's expert testimony in two ways. Neither warrants relief.

### 1. The district court did not abuse its discretion in declining to conduct a pretrial Daubert[6] hearing

Earls first contends that the district court abused its discretion in declining to conduct a pretrial Daubert hearing on "the reliability or methodology" of Nurse Sanford's "assessment of C.P.'s cognitive abilities." (Aplt. Br. 33.) As we explain, Earls never asked the district court to conduct a pretrial hearing on that specific issue

---

[6] Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

and the court otherwise properly determined that a pretrial <u>Daubert</u> hearing was unnecessary.

### a. Relevant law

Federal Rule of Evidence 702 addresses expert testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and
>
> **(d)** the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Thus, Rule "702 requires the district court to 'ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" <u>Bill Barrett Corp. v. YMC Royalty Co.</u>, 918 F.3d 760, 770 (10th Cir. 2019) (per curiam) (quoting <u>Daubert</u>, 509 U.S. at 597).

> Under Rule 702, the court must first decide whether the proffered expert is qualified "by knowledge, skill, experience, training, or education" to render an opinion. <u>See</u> Fed. R. Evid. 702. Then "the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology, as set forth in <u>Daubert</u>." <u>United States v. Nacchio</u>, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc). "Where an expert testifies based on experience, the tribunal reviews the reliability of the testimony with reference to 'the nature of the issue, the expert's

15

particular expertise, and the subject of the testimony.'" F & H Coatings, LLC v. Acosta, 900 F.3d 1214, 1222 (10th Cir. 2018) (quoting Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 148–50 (1999)).

Id. at 770.  Next, the court must decide whether the proffered expert's opinion is relevant; that is, whether it "will help the trier of fact to understand the evidence or to determine a fact in issue."  Rule 702(a).

A district court is not required to hold a pretrial Daubert hearing in order to make these determinations that Rule 702 requires.  See United States v. Mathews, 928 F.3d 968, 979 (10th Cir. 2019); Bill Barrett, 918 F.3d at 772; Nacchio, 555 F.3d at 1251, 1253–54.  "[T]he manner in which the court conducts its Rule 702 analysis is left to the court's sound discretion."  United States v. Chapman, 839 F.3d 1232, 1239 (10th Cir. 2016).  However,

> [t]he court, when faced with a party's objection, must "adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper." United States v. Avitia-Guillen, 680 F.3d 1253, 1256 (10th Cir. 2012). "This gatekeeper function requires the judge to assess the reasoning and methodology underlying the expert's opinion, and determine whether it is scientifically valid and applicable to a particular set of facts." Goebel v. Denver & Rio Grande W. R.R. Co., 215 F.3d 1083, 1087 (10th Cir. 2000).

Bill Barrett, 918 F.3d at 770.  On the other hand, "[w]hen no objection is raised, district courts are not required to make explicit on-the-record rulings."  Mathews, 928 F.3d at 979.

### b. Relevant background

In this case, the Government notified Earls that it intended to present expert testimony from Nurse Sanford about the sexual assault nurse examination ("SANE")

16

she conducted with C.P. on February 20, 2020.  The notice indicated that the

Government expected Nurse Sanford to testify as to her experience and training in

conducting SANEs, that SANEs generally rely on a victim's statements and a

physical examination of the victim, and about the specific findings Nurse Sanford

made as a result of the SANE she conducted on C.P.  The Government did not

indicate that Nurse Sanford would testify about C.P.'s cognitive abilities.  The

Government also provided the defense with a copy of Nurse Sanford's report based

on her SANE with C.P.

Earls then filed a motion for a pretrial Daubert hearing on Nurse Sanford's

expert testimony.[7]  In his motion for a hearing, Earls argued, among other things, that

to the extent that Nurse Sanford would testify that her physical exam revealed that

C.P. had been sexually penetrated, that testimony would be irrelevant because there

was no dispute that Earls and C.P. had had sex.  Earls further argued that, while, in a

child sexual abuse case, a qualified expert like Nurse Sanford can inform the jury of

the general characteristics of sexually abused children, her testimony was not

relevant here because this was "not a child sexual abuse case."  (I R. 107.)

Rather, Earls asserted that the primary question at trial was whether C.P. was

incapable of appraising the nature of the sexual conduct.  But, Earls noted, Nurse

---

[7] Earls also filed a motion in limine seeking to exclude Nurse Sanford's testimony. He does not specifically challenge on appeal the district court's decision to deny that motion.

"Stanford [sic] performed no testing relevant to" that question.[8]  (Id. at 108.)

Furthermore, Earls was "unaware of any training that would qualify Cynthia Sanford

as an expert who can render an opinion as to C.P.'s cognitive abilities."  (Id.)

Therefore, Earls argued that Nurse "Sanford should not be permitted to either repeat

what C.P. told her during her examination or render a conclusion of 'confirmed

sexual abuse' as diagnosed in her report."  (Id.)

In opposing a pretrial Daubert hearing, the Government noted that such a

hearing is not required; instead, "a judge may fulfill his gatekeeper obligation when

asked to rule on an objection during trial so long as the court has sufficient evidence

to perform the task of ensuring reliability and relevance."  (I R. 128 (quotation

omitted).)

The district court determined that a pretrial Daubert hearing on Nurse

Sanford's proffered expert testimony was unnecessary.  It ruled, in response to Earls'

argument that Nurse "Sanford should not be permitted to . . . render a conclusion of

'confirmed sexual abuse' as diagnosed in her report" (I R. 108), that that argument

was moot: "The Government . . . informs the court that Ms. Stanford [sic] will not

. . . state an opinion as to rape" (I R. 175).  The district court also ruled that

"statements made by C.P. to Ms. Sanford during the SANE examination are

admissible under Fed. R. Evid. 803(4)" and noted that the Government had indicated

---

[8] In his pretrial motion in limine seeking to exclude Nurse Sanford's testimony, Earls
again stated that "Cynthia Stanford [sic] performed no testing relevant to the question
of C.P.'s ability to appraise the nature of a sexual act."  (I R. 99.)  The record
supports that statement.

"that Ms. Stanford [sic] will not vouch for C.P.'s credibility." (I R. 175–76.) Further, the court ruled that "Ms. Sanford's findings during the SANE examination are relevant to the issues the Government must prove," notwithstanding Earls' admission to having sex with C.P. (I R. 175.) Finally, the court held that Nurse Sanford's curriculum vitae "listing her education and experience is sufficient to show that her testimony regarding the SANE examination of C.P. has a reliable basis in the knowledge and experience of her discipline, and a Daubert hearing is not necessary." (I R. 176.)

### c. The district court did not abuse its discretion in declining to conduct a pretrial Daubert hearing as unnecessary

The district court did not abuse its discretion in denying a pretrial Daubert hearing. On appeal, Earls asserts a number of arguments challenging that decision. Earls first contends that the district court should have conducted a pretrial Daubert hearing on "the reliability or methodology" of Nurse Sanford's "assessment of C.P.'s cognitive abilities." (Aplt. Br. 33.) But, as just explained, Earls never requested that the district court consider the reliability or methodology of any assessment Nurse Sanford may have made of C.P.'s cognitive abilities.[9] See Mathews, 928 F.3d at 979 (noting district court is not required to make findings when litigant does not make Daubert

---

[9] As just explained, Earls instead challenged the relevance of Nurse Sanford's proffered testimony, which challenge the district court expressly rejected. See Avitia-Guillen, 680 F.3d at 1257 ("Where a party objects only to an expert's qualifications, he does not preserve an objection to the expert's methodology.") The district court also addressed the reliability of Nurse Sanford's proffered testimony as to the SANE exam she conducted. Earls does not challenge those rulings on appeal.

19

argument). In fact, Earls specifically acknowledged in his pretrial motions that Nurse Sanford did <u>not</u> assess C.P.'s capability in appraising the nature of the conduct between her and Earls. Furthermore, there is no indication in the record that Nurse Sanford ever assessed C.P.'s cognitive abilities.[10]

Earls' theory, asserted for the first time on appeal, is that, because Nurse Sanford diagnosed "sex abuse," and because that is the title of the offenses with which the Government later charged Earls, and because those offenses require proof that C.P. was incapable of appraising the nature of the sexual conduct between her and Earls, therefore when Nurse Sanford diagnosed "sexual abuse," she must have implicitly found that C.P. was incapable of appraising the nature of the sexual conduct. The district court did not abuse its discretion in not conducting a pretrial <u>Daubert</u> hearing on this implicit finding that Earls only now attributes to Nurse Sanford. Earls did not request that the district court make that determination prior to trial and the record does not suggest that Nurse Sanford ever made such an assessment.

To the extent Earls sought a pretrial <u>Daubert</u> hearing to preclude Nurse Sanford from testifying that she diagnosed sexual abuse, the Government asserted in its pretrial pleadings that Nurse Sanford would not "state a diagnosis that the victim

---

[10] At trial, Nurse Sanford testified, without objection, that C.P.'s responses to the interview questions were more like those of a ten- to twelve-year-old than an eighteen-year-old. Earls never challenged that assessment in his pretrial motions. Nor did he raise that argument on appeal until his reply brief, which is too late. <u>See</u> <u>Ctr. for Biological Diversity v. U.S. E.P.A.</u>, 82 F.4th 959, 969 n.8 (10th Cir. 2023) (declining to consider argument raised for the first time in reply brief).

was raped by the Defendant." (I R. 138.) The district court did not abuse its discretion in relying on that Government assertion to conclude a pretrial <u>Daubert</u> hearing was unnecessary on Nurse Sanford's "sexual abuse" diagnosis.[11]

The district court did not otherwise abuse its discretion in declining to conduct a pretrial <u>Daubert</u> hearing. The district court, in its pretrial order denying a hearing, deemed Nurse Sanford "qualified" to testify as to her SANE of C.P. based on Nurse Sanford's curriculum vitae ("C.V."): "The court . . . finds that Ms. Stanford's [sic] C.V. listing her education and experience is sufficient to show that her testimony regarding the SANE examination of C.P. has a reliable basis in the knowledge and experience of her discipline, and a <u>Daubert</u> hearing is not necessary." (I R. 176 (record citation omitted). On appeal, Earls does not challenge that ruling.

Instead, Earls argues on appeal that Nurse Sanford was not qualified to testify as to C.P.'s cognitive abilities. But Earls never requested a pretrial hearing on that issue and there is no indication in the record that Nurse Sanford ever assessed C.P.'s cognitive abilities.

The district court also deemed Nurse Sanford's testimony about the SANE she conducted with C.P. to be relevant to the issues before the jury. Earls does not challenge that determination on appeal.

---

[11] We reach this conclusion even though Earls' motion sought to preclude Nurse Sanford from testifying that she diagnosed sexual abuse, while the Government, in responding, and the trial court, in ruling, referenced a rape diagnosis instead. The record indicates that the parties and the court were addressing the same potential diagnosis testimony from Nurse Sanford.

Earls has not established, therefore, that the district court abused its discretion in declining to conduct a pretrial <u>Daubert</u> hearing. That decision, however, did not foreclose Earls from making objections at trial to Nurse Sanford's testimony: "A <u>Daubert</u> hearing is not specifically mandated and a judge may fulfill his gatekeeper obligation when asked to rule on an objection during trial . . . so long as the court has sufficient evidence to perform the task of ensuring reliability and relevance." <u>Bill Barrett</u>, 918 F.3d at 770 (internal quotation marks omitted). But at trial, Earls did not object to Nurse Sanford's testimony on the basis that she was offering an opinion as to C.P.'s cognitive abilities that was not reliable. The trial court sustained two defense objections to questions seeking Nurse Sanford's opinion as to whether C.P. was capable of making legal or medical decisions for herself.

**2. The trial court did not plainly err in allowing Nurse Sanford to testify that she "diagnosed" C.P. as having been sexually abused**

At trial, at the end of her direct examination, the prosecutor asked Nurse Sanford, "did you reach a diagnosis for C.P.? A. I did. Q. And did you diagnose her as the victim of sexual abuse/sexual assault? A. Yes." (I R. 344.) Defense counsel did not object. Earls challenges that testimony now on appeal. This court reviews that argument for plain error. <u>See Mathews</u>, 928 F.3d at 979; <u>see also</u> Fed. R. Crim. P. 52(b). To obtain relief under a plain-error analysis, Earls must establish "(1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights. If he satisfies these criteria, this Court may exercise discretion to correct the error if (4) it seriously affects the fairness, integrity, or

22

public reputation of judicial proceedings." United States v. Parson, 84 F.4th 930, 940 (10th Cir. 2023) (quoting United States v. Rosales-Miranda, 755 F.3d 1253, 1258 (10th Cir. 2014)), cert. denied, 144 S. Ct. 1125 (2024).[12]

Earls may have established plain error because the Government had responded pretrial that Nurse Sanford would not testify as to her "diagnosis" of "rape[]."  (I R. 138.)  Even if Earls has shown plain error, however, he has not shown that the error affected his substantial rights; that is, that there is a reasonable probability that, without Nurse Sanford's testimony that she diagnosed "sexual assault/sexual abuse," the jury would have acquitted Earls.  (I R. 320.)   See Parson, 84 F.4th at 940.  Nurse Sanford's diagnosis of "sexual assault/sexual abuse" appears to have been predicated on her physical examination of C.P., which confirmed that C.P. had had sex, and perhaps on Nurse Sanford's unobjected-to testimony that C.P. said she was afraid of Earls.  There was no dispute that C.P. and Earls had had sex and Earls does not challenge Nurse Sanford's testimony that C.P. said she was afraid of Earls.  More to the point, there was no objection, at trial or now, about Counselor Dennis's testimony, earlier in the trial, twice referred to her counselling C.P. in an effort to help her recover from the trauma of being raped by Earls.  Under these

---

[12] Earls argues that he made this argument in his pretrial motions sufficient to preserve the argument for abuse-of-discretion, instead of plain error, review.  We disagree.  The district court did not definitively rule on Earls' pretrial motions seeking to exclude Nurse Sanford's sexual abuse diagnosis.  The court instead deemed that pretrial request to be moot based on the Government's assertion that it would not present testimony of Nurse Sanford's sexual abuse diagnosis.  When the Government did present that testimony at trial, Earls did not object.

circumstances, any plain error in allowing Nurse Sanford to testify that she "diagnosed" "sexual assault/sexual abuse" does not warrant relief at either the third or the fourth step of the plain-error analysis.[13]

## C. The prosecutor's closing argument

Earls next asserts that the prosecutor deprived him of due process by arguing to the jury, in the Government's rebuttal closing: "You are the 12 members of our community who have been picked to say whether it was right or wrong for him to put his penis in her and his fingers in her and his slobber on her vagina." (I R. 473.) The trial court overruled Earls' objection to that remark as a misstatement of law. On appeal, Earls contends that the prosecutor intended this comment to urge jurors improperly to ignore the law and instead to determine whether Earls' conduct was morally right or wrong.

Where, as here, the defendant objects and the court overrules the objection, this court reviews the prosecutor's challenged comment de novo. See United States v. Currie, 911 F.3d 1047, 1056 (10th Cir. 2018). "Prosecutorial misconduct violates a defendant's due process rights if it infects a trial with unfairness and denies the defendant the right to a fair trial." Id. at 1055. "The misconduct analysis proceeds in

---

[13] Earls also argues on appeal that, even if Nurse Sanford's challenged testimony was generally admissible, its probative value was outweighed by its unfair prejudice to Earls. (Aplt. Br. 42 (citing Fed. R. Evid. 403).) He did not make that argument at trial, however, and he does not make a plain-error analysis on appeal. See United States v. McGlothin, 705 F.3d 1254, 1260 (10th Cir. 2013) (reviewing for plain error Rule 403 argument raised for the first time on appeal). He has, therefore, waived this argument. See United States v. Sumka, 81 F.4th 1153, 1159 n.3 (10th Cir. 2023).

two steps: (1) we decide whether the prosecutor's comments were improper, and (2) if they were, we examine the likely effect of the comments on the jury's verdict." Id. The Government must demonstrate that any improper remark was harmless beyond a reasonable doubt. Id. at 1057.

Here, when read in light of the prosecutor's entire closing argument, the challenged comment was not improper. See generally id. at 1056 ("We examine alleged improper comments in context."). It was arguably ambiguous. Jurors may have understood the prosecutor's "right or wrong" comment to reiterate that, simply and accurately, it was their job to determine whether or not Earls had violated the law by having sex with C.P., instead of urging jurors to make a moral judgment as to the charged sexual conduct. See id. (stating that "courts 'should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning'" (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 647 (1974)); see also United States v. Woods, 764 F.3d 1242, 1247 (10th Cir. 2014).

Even if the prosecutor's remark was improper, however, it was harmless beyond a reasonable doubt. See Currie, 911 F.3d at 1057. The trial court instructed jurors generally that Earls was "not on trial for any act, conduct, or crime not charged in the indictment" (I R. 187), and that jurors "must not substitute or follow your own notion or opinion as to what the law is or ought to be" (I R. 184). The court further instructed jurors:

> You must make your decision based only on the evidence that you saw and heard here in court. . . .

25

The evidence in this case includes only what the witnesses said when they were testifying under oath, the exhibits that I allowed into evidence, the stipulations that the lawyers agreed to, and the facts that I have judicially noticed.

Nothing else is evidence. The lawyers' statements and arguments are not evidence. . . .

(I R. 190.) See United States v. Anaya, 727 F.3d 1043, 1059 (10th Cir. 2013) (indicating that prosecutor's improper remark was harmless beyond a reasonable doubt where the court instructed jurors that attorneys' statements were not evidence (citing United States v. Rogers, 556 F.3d 1130, 1142–43 (10th Cir. 2009))). The trial court also instructed jurors exactly what elements they had to find beyond a reasonable doubt in order to convict Earls. "The jury is presumed to follow its instructions, even when there has been misleading argument." Currie, 911 F.3d at 1056 (quoting Bland v. Sirmons, 459 F.3d 999, 1015 (10th Cir. 2006)).

**D. Sentencing error**

Lastly, the Government correctly concedes that the district court erred in calculating Earls' advisory guideline sentencing range. The district court incorrectly added two criminal history points under U.S.S.G. § 4A1.1(d) (2021) for "committ[ing] the instant offense[s] while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status." On appeal, the Government, after reviewing the record and Oklahoma precedent, concedes that "Earls was . . . no longer serving a criminal justice sentence during the time frame in which he assaulted the victim in this case." (Appellee

26

United States' Notice Regarding Confession of Error dated Nov. 14, 2023, at 2.)  In light of this conceded sentencing error, we remand for resentencing.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM Earls' convictions, but we REMAND this case to the district court with instructions to vacate Earls' sentence and to resentence him consistent with this opinion.